UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| DUSTIN BRINAGER, | : | Case No. 1:14-cv-252 |
| t/a DUSTY ACRES, | : | |
| | : | Judge Timothy S. Black |
| Plaintiff, | : | |
| | : | |
| vs. | : | |
| | : | |
| JAO DISTRIBUTORS, INC., | : | |
| d/b/a GENTILE BROS. COMPANY, *et al.*, | : | |
| | : | |
| Defendants. | : | |

**ORDER DENYING DEFENDANT FIFTH THIRD'S MOTION
FOR SUMMARY JUDGMENT (Doc. 40);
DENYING INTERVENING DEFENDANT LEONARD EPPEL'S MOTION
FOR SUMMARY JUDGMENT (Doc. 43); AND
DENYING PLAINTIFF DUSTIN BRINAGER'S MOTION
FOR SUMMARY JUDGMENT (Doc. 46)**

This civil action is before the Court on Defendant Fifth Third Bank's motion for

summary judgment (Doc. 40), Intervening Defendant Leonard Eppel's motion for

summary judgment (Doc. 43), Plaintiff Dustin Brinager's motion for summary judgment

(Doc. 46), and the parties' responsive memoranda (Docs. 48, 49, 50, 51, and 52).[1]

---

[1] Plaintiff brought this civil action against Defendants JAO, Oaks Investments, LLC, Jeffrey A. Oaks, and Fifth Third. (Doc. 1). Plaintiff pled the following counts: (1) failure to pay trust funds against JAO and Jeffrey A. Oaks; (2) failure to pay for goods sold against JAO; (3) dissipation of trust assets by corporate official against Jeffrey A. Oaks; (4) declaratory judgment for unlawful receipt and retention of PACA trust assets against Oaks Investments, LLC; (5) alter ego against Oaks Investments, LLC; (6) unlawful retention of PACA trust assets against Fifth Third; and (7) declaratory judgment of lien subordination against Fifth Third. (*Id.*) On June 13, 2014, the Court granted Eppel's motion to intervene. (June 13, 2014 Notation Order). On July 23, 2014, the Court entered default judgment against JAO and Oaks Investments, LLC. (Doc. 32). On August 1, 2014, the Court stayed this civil action as to Jeffrey A. Oaks upon notice that he had filed for Chapter 7 bankruptcy. (Doc. 35). To date, that stay remains in place.

# I.    BACKGROUND

Congress enacted the Perishable Agricultural Commodities Act ("PACA"), 7 U.S.C. § 499a, *et seq*., to promote fair trading practices in the produce industry. Plaintiff Dustin Brinager, trading as Dusty Acres, is a farmer who grows and sells produce. Plaintiff held a PACA license, which was issued by the United States Department of Agriculture ("USDA") on May 21, 2012 and had an anniversary date of May 21, 2013. Plaintiff did not submit a license renewal application or pay the renewal fee prior to the anniversary date. Accordingly, Plaintiff's PACA license automatically terminated on the anniversary date. *See* 7 U.S.C. § 499d(a).

On July 1, 2013, Denetra McPherson, a USDA representative, e-mailed Plaintiff to notify him that his license was past due. Plaintiff submitted a renewal application via fax on July 10, 2013. Thereafter, Plaintiff assumed that his PACA license had been reinstated. Between August 3, 2013 and September 9, 2013, Plaintiff sold $251,017 worth of produce to Defendant JAO Distributors, Inc. ("JAO"), doing business as Gentile Bros. Company. Defendant Fifth Third Bank ("Fifth Third") had loaned JAO a substantial amount of money, and JAO had granted Fifth Third a security interest in its assets.

In October 2013, JAO ceased its operations. Under PACA, produce sellers who meet certain requirements have priority claims to assets which are part of a statutory trust. Intervening Defendant Leonard Eppel ("Eppel") was retained to settle JAO's debts with its PACA claimants. Eppel relied on a determination that Plaintiff's PACA license was terminated, rendering him unable to make a priority claim. JAO's remaining assets

were distributed, and Plaintiff was never paid for his produce.

Between August and December 2013, McPherson sent Plaintiff three additional e-mails regarding his PACA license.  Therein, she advised Plaintiff that he was not currently licensed.   In February 2014, Plaintiff's mother, Lori Brinager, and Plaintiff's counsel, Louis Diess, III, Esq., contacted Jeffrey Davis, Director of the USDA National Licensing Center, PACA Division, regarding Plaintiff's PACA license.  In a letter dated February 18, 2014, Davis admitted that the USDA mishandled Plaintiff's renewal application and retroactively reinstated Plaintiff's PACA license as of May 21, 2013, "with all rights, duties and obligations remaining in full force and effect at all times." (Doc. 41, Ex. 1, Brinager Document Production at 146–47).

Plaintiff and Fifth Third have filed cross-motions for summary judgment.  Plaintiff argues that he is entitled to summary judgment on his claims against Fifth Third because he preserved his PACA trust rights with respect to the produce he sold to JAO and funds Fifth Third received from JAO are trust assets subject to disgorgement.  (Doc. 46-1). Fifth Third argues that it is entitled to summary judgment because Plaintiff did not hold a valid PACA license at the time he delivered produce to JAO and, even if he did, Fifth Third is protected by a bona fide purchaser defense.  (Doc. 40).  Eppel seeks summary judgment on all of Plaintiff's claims.  (Doc. 43).  He argues that the USDA did not have the power to retroactively reinstate Plaintiff's license and, regardless of whether Plaintiff held a valid and effective license, he is equitably estopped from asserting PACA trust

3

beneficiary status.  (*Id.*)[2]

## II.    UNDISPUTED FACTS

### A. In Support of Defendant Fifth Third's Motion for Summary Judgment[3]

1. Brinager, t/a Dusty Acres ("Brinager"), shipped produce to JAO Distributors, Inc. ("JAO Distributors") between August 3, 2013 and September 9, 2013.  (Doc 1 at ¶ 6).

2. Fifth Third Bank ("Fifth Third") is in possession of a Term Note dated April 13, 2012 in the original principal amount of $2,700,000 ("Note I" or "Term Loan"), and executed by JAO Distributors and JAO Logistics, LLC ("JAO Logistics") (together, "JAO").  (Doc. 42-1, Ex. A).[4]

3. Fifth Third received four payments from JAO on the Term Loan after August 3, 2013: two payments on August 30, 2013 ($47,917 principal and $7,250.80 interest) and two payments on October 1, 2013 ($59,000 principal and $6,835.89 interest).  (*Id.*, Ex. B).

4. Fifth Third and JAO are parties to a Credit Agreement dated April 13, 2012 ("Credit Agreement").  (*Id.*, Ex. C).

5. The Credit Agreement was amended by virtue of the First Amendment to Credit Agreement.  (*Id.*, Ex. D).

6. Fifth Third, JAO Distributors, and JAO Logistics are parties to a Master Loan Agreement dated April 13, 2012 ("Master Loan Agreement").  (*Id.*, Ex. E).

7. Fifth Third is in possession of a Promissory Note dated April 13, 2012 in the original principal amount of $1,750,000 ("Note II" or "Equipment Loan"), and executed by JAO Distributors and JAO Logistics.  (*Id.*, Ex. F).

8. Fifth Third received four payments from JAO on the Equipment Loan after August 3, 2013:  two payments on September 1, 2013 ($20,833.33 principal and $5,350.31

---

[2] Eppel also argues and that he is entitled to absolute judicial or qualified immunity.  However, Plaintiff has not asserted any claims against Eppel in this action.  (*See* Doc. 1).  Accordingly, the Court need not reach the question of whether Eppel is entitled to such immunity.

[3] *See* Docs. 40-1 and 48-1.

[4] The Court includes cents only where the amount is not a round dollar figure.

interest) and two payments on October 1, 2013 ($20,833.33 principal and $4,773.20 interest).  (*Id*., Ex. G).[5]

9. Fifth Third is in possession of a Mortgage Note from Oaks Investments, LLC ("Oaks Investments") dated April 13, 2012, in the face amount of $1,800,000 ("Note III" or "Mortgage Loan").  (*Id.*, Ex. H).

10. Fifth Third received four payments from JAO on the Mortgage Loan after August 3, 2013:  two payments on August 30, 2013 ($7,500 principal and $6,175.78 interest) and two payments on October 1, 2013 ($7,500 principal and $5,948.23 interest).  (*Id.*, Ex. I).

11. As inducement for Fifth Third to extend the funds represented by Notes I, II, and III (collectively, "Notes" or "Loans") to JAO Distributors, JAO Logistics, and Oaks Investments, Jeffrey A. Oaks executed a Commercial Guaranty dated April 13, 2012 ("Guaranty I"), in which he absolutely and unconditionally guaranteed and promised to pay the Obligations of JAO Distributors, JAO Logistics, and Oaks Investments (as defined in Guaranty I) to Fifth Third.  (*Id.*, Ex. J).

12. As inducement for Fifth Third to extend the funds represented by Notes I and II to JAO Distributors and JAO Logistics, Oaks Investments executed a Commercial Guaranty dated April 13, 2012 ("Guaranty II"), in which it absolutely and unconditionally guaranteed and promised to pay the Obligations of JAO Distributors and JAO Logistics (as defined in Guaranty II) to Fifth Third.  (*Id.*, Ex. K).

13. As inducement for Fifth Third to extend the funds represented by Note III to Oaks Investments, JAO Distributors and JAO Logistics executed a Commercial Guaranty dated April 13, 2012 ("Guaranty III") (together with Guaranty I and Guaranty II, "Guaranties"), in which they absolutely and unconditionally guaranteed and promised to pay the Obligations of Oaks Investments (as defined in Guaranty III) to Fifth Third.  (*Id.*, Ex. L).

---

[5] A comparison of Doc. 42-1, Ex. G and Doc. 46-29 reveals a small discrepancy in the amount paid on the Equipment Loan on October 1, 2013.  This discrepancy is immaterial, so the Court treats this fact as undisputed.

14. On January 29, 2014, Fifth Third reduced the Notes and Guaranties to judgment in the Hamilton County Court of Common Pleas, Case No. A1400528, in the principal sum of $1,672,500 as of January 10, 2014, plus interest of $20,534.58, which continues to accrue at the per diem rate of $197.45,[6] plus late fees of $2,033.25, other fees of $50, and attorney's fees and costs incurred of $13,751.20 as of January 22, 2014. (*Id.*, Ex. M).

15. Fifth Third is the holder of an Open-End Mortgage, Assignment of Rents and Security Agreement dated April 13, 2012 ("Mortgage"), given to secure payments of the Notes and Guaranties. (*Id.*, Ex. N).

16. The Mortgage was filed for record on April 16, 2012 and recorded in Official Record Book 11992, Page 1388 of the Hamilton County, Ohio Recorder's records. (*Id.*)

17. Fifth Third is also in possession of Security Agreements dated April 13, 2012, in which Debtors, on behalf of JAO, pledged Collateral (as defined in the Security Agreements) to Fifth Third and granted Fifth Third a blanket lien that encumbered all of JAO's accounts, proceeds, inventory, equipment, and other property. (*Id.*, Ex. O).

18. Fifth Third perfected its security interests in the Assets by virtue of filing UCC Financing Statements against the Borrowers with the Ohio Secretary of State on April 13, 2012. (*Id.*, Ex. P).

19. The commercial loans made by Fifth Third to JAO which closed on April 13, 2012 enabled JAO, in part, to acquire legal title to the assets of Gentile Bros. Company and GB Logistics LLC, a produce business. (*Id.*, Ex. C at § 2.3(g)).

20. On or about October 2, 2013, Fifth Third received $99,811.98 from the sale of its secured collateral. (*Id.*, Ex. Q).

21. On or about October 8, 2013, JAO (with Fifth Third's consent) installed Leonard Z. Eppel of Financial Resource Associates as its Chief Restructuring Officer for the purpose of collecting JAO's accounts receivable, negotiating with JAO's PACA claimants, and settling JAO's debts with the PACA claimants using JAO's accounts receivable. (Doc. 42 at ¶ 23).

---

[6] The Court rounded this figure.

22. On February 28, 2014, Eppel was appointed as Receiver for JAO's business assets ("Receiver") in Case No. A1400258, which was later consolidated into Case No. A1307682, of the Court of Common Pleas, Hamilton County, Ohio.  (*Id.* at ¶ 24).

23. With court approval, the Receiver sold Fifth Third's collateral by public auction on October 30, 2014 ("Receiver Sale").  (*Id.* at ¶ 25; *see also* Doc. 42-1, Ex. R (a description of the collateral sold at the Receiver Sale)).

24. As a result of the Receiver Sale, Fifth Third received, on or about December 5, 2014, a check in the amount of $250,000 and a check in the amount of $5,000 from the Receiver.  (Doc. 42 at ¶ 26; Doc. 42-1, Ex. S).

25. Funds from JAO's accounts were timely applied to JAO's loans with Fifth Third prior to October 31, 2013.  (Doc. 42-1., Exs. B, G, I, T).

26. JAO pledged its accounts receivable to Fifth Third as security for the Loans.  (*Id.*, Exs. C, D, E, N, O).

27. An Accounts Payable Report dated November 13, 2013 was generated by JAO and given to Fifth Third and listed Dusty Acres as "Non-PACA."  (Doc. 42-1, Ex. U).

28. Fifth Third prepared an Administrative Loan Status Report on November 18, 2013.  (*Id.*, Ex. T).

29. In September 2013, Jeffrey Oaks advised Fifth Third that he expected to inject $200,000–$260,000 in cash into JAO by the end of the month.  (*Id.*)

30. In September 2013, Jeffrey Oaks advised Fifth Third that he was working with his family to secure additional capital investment in JAO to offset year-to-date losses.  (*Id.*)

31. Jeffrey Oaks has since filed Chapter 7 bankruptcy.  *In re: Jeffrey Allen Oaks*, Bankr. S.D. Ohio, Case No. 14-12865 ("Bankruptcy Case").

32. In his bankruptcy petition, Jeffrey Oaks lists a debt owed to his father's business trust of $750,000 that was incurred on April 12, 2012.  (Bankruptcy Case, Doc. 1 at 23).

33. In his bankruptcy petition, Jeffrey Oaks lists a $3,000,000 debt to Ken Oaks for a business loan.  (Bankruptcy Case, Doc. 1 at 27).

34. Ken Oaks had loaned JAO $3,000,000.  (Doc. 42-1, Ex. C at 23 ("Oaks Subordinated Debt")).

35. In his personal financial statement, Jeffrey Oaks represented to Fifth Third that he had a $2.5 million equity interest and a substantial net worth.  *Fifth Third v. Oaks*, Bankr. S.D. Ohio Adv. No. 15-01010.

36. Brinager failed to renew his PACA license on or before May 21, 2013.  (Doc. 41, Ex. 1, Interrogatory No. 11).

37. On June 10, 2013, Denetra McPherson at the United States Department of Agriculture (USDA) e-mailed Brinager about his PACA license.  (*Id.*, Ex. 1, Brinager Document Production at 138-41).

38. Brinager did not respond to McPherson's June 10, 2013 e-mail.  (*Id.*)

39. On June 19, 2013, McPherson e-mailed Brinager regarding potential cancellation of his PACA license.  (*Id.*)

40. Brinager did not respond to McPherson's June 19, 2013 e-mail.  (*Id.*)

41. On July 1, 2013, McPherson e-mailed Brinager, advising him that operating without a PACA license is a federal offense and that fines of $1,200 and $350 may be imposed if a violation is found.  (*Id.*)

42. Brinager responded to McPherson's July 1, 2013 e-mail, advising that he would be faxing in payment for license reinstatement.  (*Id.*)

43. On August 26, 2013, McPherson e-mailed Brinager advising that he needed to apply for a new PACA license and pay additional amounts.  (*Id.*)

44. Brinager did not respond to McPherson's August 26, 2013 e-mail.  (*Id.*)

45. On September 10, 2013, McPherson e-mailed Brinager reminding him that it is unlawful to operate without a PACA license and that, if found to be doing so, his company may be subject to fines.  (*Id.*)

46. Brinager did not respond to McPherson's September 10, 2013 e-mail.  (*Id.*)

47. On December 10, 2013, McPherson e-mailed Brinager regarding his PACA license. (*Id.*)

48. Brinager responded to McPherson's December 10, 2013 e-mail, claiming that he faxed paperwork to McPherson back in July. (*Id.*)

49. On February 12, 2014, Brinager's mother, Lori Brinager, e-mailed Jeffrey Davis at the USDA regarding Brinager's PACA licensing situation. (*Id.* at 142).

50. On February 13, 2014, Brinager's counsel, Louis Diess, III, Esq., also e-mailed Davis to discuss Brinager's situation. (*Id.* at 130).

51. On February 18, 2014, Davis sent a letter to Brinager purporting to retroactively reinstate his PACA license. (*Id.* at 146-47).

52. JAO prepared an Accounts Payable Record dated October 30, 2013 that differentiated between PACA and non-PACA creditors. (Doc. 16-1 at ¶ 14, Ex. D).

53. In October and November 2013, Eppel made payment arrangements with PACA claimants to settle claims against JAO. (*Id.* at ¶ 9).

54. USDA records indicated that Brinager did not have a valid PACA license. (*Id.* at ¶ 13).[7]

---

[7] In his affidavit, Eppel stated: "But when JAO paid out its PACA trust assets to the properly licensed PACA creditors in October and November of 2013, USDA records actually reflected that Plaintiff held no PACA license because it had been terminated." (*Id.*) (citing Doc. 16-1, Ex. H). However, in response to Plaintiff's second set of discovery requests, Eppel stated: "Both the company and Jason Stitt, Esq. had been operating in this industry and had considerable experience with PACA matters, including existing relationships with PACA creditors and the ability to check FDA's public record to confirm which creditors were PACA license holders. I relied on their determination that Plaintiff did not possess a PACA license at the relevant time and I did not conduct an independent investigation." (Doc. 46-27, Response No. 3) (emphasis added). Neither Eppel nor Fifth Third offer (1) any explanation for this discrepancy; or (2) affidavits from anyone with personal knowledge regarding actions they undertook to verify Plaintiff's PACA licensing status (or when they undertook those actions). However, Eppel and Fifth Third have provided a copy of a USDA record, albeit undated, showing that Plaintiff's license was terminated. (Doc. 16-1, Ex. H; Doc. 44, Ex. J). This record supports the undisputed fact above.

**B.  In Support of Intervening Defendant Leonard Eppel's Motion for Summary Judgment**[8]

1.  At the request of the defendants (JAO and Oaks Investments, LLC), and secured lender Fifth Third Bank, the Hamilton County Court of Common Pleas appointed Leonard Eppel of Financial Resource Associates, Inc. as the Receiver for Oaks Investments, LLC in Case No. A1307682 in December 2013 (Doc. 44, Ex. A) and JAO Distributors, Inc., d/b/a Gentile Bros. Co. ("JAO") in Case No. A1400528 in February 2014 (*Id.*, Ex. B), which was later consolidated into Case No. A1307682. (*Id.*, Ex. C).

2.  The appointment orders authorized the Receiver to take possession of the defendants' assets and to operate them with a primary purpose of paying creditors.

3.  Brinager held PACA license number 20121026 as a "wholesale dealer."  The license had an issue date May 21, 2012 and an anniversary date of May 21, 2013. (*Id.*, Ex. D).

4.  Brinager filed his PACA license reinstatement application on July 10, 2013.  (*Id.*, Ex. E, Interrogatory No. 12, Ex. G).

5.  After Brinager applied for reinstatement, he assumed that his PACA license had been reinstated.  (*Id.*, Ex. E, Interrogatory No. 12).

6.  Between August and December 2013, USDA, through Denetra McPherson, sent e-mails to Brinager advising him that his license had been terminated and of the potential consequences thereof.  (*Id.*, Ex. E, Interrogatory No. 12, Ex. F).

7.  In late January 2014, Brinager checked the USDA website and realized that the public record was showing that his license was terminated, causing him to resubmit his reinstatement application information by e-mail.  (*Id.*, Ex. E, Interrogatory No. 12, Ex. H).

8.  Brinager's claims arise out of transactions that occurred from August 3, 2013–September 9, 2013.  (Doc. 1 at ¶ 6; Doc. 44, Ex. I).

9.  USDA public record stated that Brinager's PACA license was terminated.  (Doc. 44, Ex. J).[9]

---

[8] *See* Docs. 43-1 and 49-2.

[9] As indicated above, this record is undated.

10. When JAO prepared its Accounts Receivable Report it categorized creditors as either "PACA" or "non-PACA." In Accounts Payable records dated October 30, 2013 and November 13, 2013, JAO listed Brinager ("Dusty Acres") as "non-PACA." (*Id.*, Exs. K, L).

11. Given JAO's experience in the industry, the Receiver deferred to JAO and its counsel and did not conduct an independent investigation into Plaintiff's license either when he was assisting the defendants to restructure or when his official appointment to Receiver became effective. (*Id.* at ¶ 16).

12. In February 2014, Brinager's counsel made a demand on JAO for priority payment based on a letter from USDA of the same date. (*Id.*, Ex. N).

13. In the reinstatement letter, Jeffrey Davis, Director of the USDA Licensing Center, apologized to Plaintiff for mishandling his application to reinstate his PACA license and stated that his license had been reinstated retroactively. (*Id.*, Ex. O).

14. By state court order, in October 2014, the Receiver sold by public auction certain collateral that secured obligations to lender Fifth Third and in December 2014, by further order of the court, the Receiver paid the proceeds from the Receiver Sale to Fifth Third. (*Id.*, Ex. P).

15. No party intervened in the receivership cases or objected to the Receiver Sale. (*Id.* at ¶ 23).

## C. In Support of Plaintiff Dustin Brinager's Motion for Summary Judgment[10]

1. Plaintiff Dustin Brinager t/a Dusty Acres ("Dusty") is an adult individual and farmer who grows produce and sells it wholesale in interstate commerce. (Doc. 1).

2. Defendant JAO Distributors, Inc. d/b/a Gentile Bros. Company ("JAO") is an Ohio corporation, now in receivership, that was in the business of buying and selling wholesale quantities of produce in interstate commerce and was, at all times pertinent herein, a dealer licensed under the Perishable Agricultural Commodities Act, 7 U.S.C. § 499a, *et seq.* ("PACA"). (Docs. 1, 16, 25, 33).

3. Defendant Oaks Investments, LLC ("Oaks Investments") is an Ohio limited liability company, now in receivership, that owned the warehouse and real property from which JAO operated. (Docs. 1, 33).

---

[10] *See* Docs. 46-31 and 50-1.

4. Defendant Jeffrey A. Oaks is an adult individual and the sole owner of JAO and Oaks Investments.  (Docs. 1, 30, 35).

5. Defendant Fifth Third Bank ("Fifth Third") is a secured lender of JAO, Oaks Investments, and Jeffrey Oaks.  (Docs. 1, 17).

6. Defendant Leonard Z. Eppel is the court-appointed Receiver for Oaks Investments and JAO in the consolidated proceeding styled as *Fifth Third Bank v. Oaks Investments LLC and Fifth Third Bank v. JAO Distributors, Inc. d/b/a/ Gentile Bros. Company*, Consolidated Case No. A1307682, Court of Common Pleas Hamilton County, Ohio.  (Doc. 16).

7. Dusty's PACA license was originally issued on May 21, 2012, with an anniversary date of May 21, 2013.  (Doc. 46-2 at ¶ 2).

8. After receiving his PACA license in May 2012, Dusty included the requisite statutory notice of intent to preserve trust rights under PACA on all invoices to customers for produce purchased, including invoices to JAO during the time period of July–October 2012.  (*Id.*)

9. In the spring of 2013, Dusty lost track of his PACA license expiration date and did not submit a renewal application to USDA prior to the license anniversary date of May 21, 2013.  (*Id.* at ¶ 4).

10. On July 1, 2013, Dusty realized his PACA license needed to be reinstated upon receiving an e-mail from a USDA employee, Denetra McPherson, advising that his license was "past due."  The July 1, 2013 e-mail from USDA to Dusty did not state that the license was "terminated."  Dusty received prior e-mails from McPherson, dated June 10, 2013 and June 19, 2013, regarding his license, but the June 2013 e-mails—like the July 1, 2013 e-mail—did not state that Dusty's PACA license had lapsed or terminated.  (*Id.*)

11. On July 1, 2013, Dusty completed the reinstatement application, including the provision of his credit card number to the USDA to pay for reinstatement, and, in an e-mail to McPherson, explained that the application and payment would be arriving by fax.  (*Id.*)

12. The reinstatement application was faxed to and received by USDA on July 10, 2013.  (*Id.*)

13. Dusty heard nothing from the USDA for several weeks and continued to farm and sell produce, including to JAO, and invoice his customers, all the while under the impression that any issues with his PACA license had been resolved.  (*Id.* at ¶ 5).

14. Dusty's sales of produce to JAO in 2013 were never paid for.  The first invoice to JAO from Dusty was dated August 3, 2013 and was  rapidly followed by transactions on August 4, 6, 7, 8, 9, 11, 13-18, 20, 23, 26–27, and 31, and September 2–3 and 9, 2013.  All of the invoices contain the requisite statutory notice of intent to preserve PACA trust rights.  (*Id.*)

15. When no payment was received, Dusty texted Defendant Jeffrey Oaks.  JAO sent payment of invoice no. 120061 in the amount of $11,850 via check no. 14666 dated September 24, 2013.  The check was deposited but was returned NSF. The check was redeposited automatically more than once, but it never cleared.  (*Id.*)

16. Dusty claims that $251,017, plus accrued statutory prejudgment interest, remains due and owing to him for the unpaid produce transactions with JAO in 2013.  (*Id.* at ¶ 10).[11]

17. On August 26, 2013, 6.5 weeks after USDA received Dusty's reinstatement application and payment information, Dusty received an e-mail from McPherson advising that although she received Dusty's "renewal" application and credit card information for his PACA license back in July 2013, she had not processed them because she had decided a different standardized form and processing fee was due since the license had been terminated.  No notice of termination had previously been given to Dusty by USDA.  (*Id.* at ¶¶ 4, 6).

18. On September 10, 2013 and December 10, 2013, Dusty received e-mails from McPherson stating that she still had not reinstated his license or processed his payment.  (*Id.* at ¶ 6).

19. On January 21, 2014, Dusty e-mailed McPherson and attached everything that had been faxed to her on July 10, 2013, but Dusty did not receive a response from USDA.  (*Id.* at ¶ 7).

---

[11] Defendant Fifth Third disputes that any amount is owed to Plaintiff but does not dispute the basis for Plaintiff's calculation of damages.

20. On February 12, 2014, Dusty's mother, Lori Brinager, called McPherson on Dusty's behalf, but the call was answered by Jeffrey Davis, chief of USDA's licensing division and McPherson's supervisor.  Lori Brinager explained the licensing situation and that USDA had failed to process Dusty's reinstatement application, and Davis advised her that he would investigate immediately.  (*Id.* at ¶ 7; Doc. 46-3 at ¶ 3).

21. On February 12, 2014, Dusty retained McCarron & Diess who promptly contacted Gentile (regarding unpaid invoices owed to Dusty) and Davis.  (Doc. 46-2 at ¶ 8).

22. On February 18, 2014, Dusty received a letter from Davis, admitting that USDA had improperly failed to process Dusty's reinstatement application or process the requisite fees via the credit card information provided, and failed to reinstate the license on July 10, 2013, as USDA should have.  (Doc. 46-2 at ¶ 9).

23. USDA reinstated Dusty's PACA license retroactively as of May 21, 2013, and further determined that Dusty's PACA license never lapsed, with all rights, duties, and obligations remaining in full force and effect at all times.  (*Id.*)

24. On or about March 12, 2012, JAO, Oaks Investments, and Jeffrey Oaks requested four secured loans or financing arrangements from Fifth Third, all cross-collateralized and guaranteed, to purchase the operations and assets of Gentile Bros. Company, a wholesale buyer and seller of fresh fruits and vegetables subject to PACA, as follows: (1) a $1,800,000 term loan to Oaks Investments to finance the purchase of the warehouse and real estate of Gentile Bros. Company; (2) a $250,000 revolving line of credit to JAO to support working capital and general business purposes; (3) a $1,750,000 term loan to JAO to purchase the existing equipment of Gentile Bros. Company; and (4) a $2,700,000 term loan to JAO to finance the purchase the business operations of Gentile Bros. Company.  The primary repayment source for all four secured loans was the cash flow from the operations of JAO, *i.e.* sales proceeds from produce.  (Doc. 46-4 at 2).[12]

25. As a condition to making the secured loans, Fifth Third required that all depository accounts of JAO and Oaks Investments be maintained at Fifth Third.  (*Id.* at 6).

26. Fifth Third recognized that produce growers had a priority lien as a result of PACA that would supersede the bank's lien on "All Business Assets" in the event that JAO Distributors would ever be in default.  (*Id.* at 8).

---

[12] In response to this and related facts (Undisputed Fact Nos. 27, 33, and 41), Defendant Fifth Third notes that although JAO applied for a $250,000 line of credit, it was never extended and, thus, never repaid.

27. On or about April 13, 2012, Fifth Third entered into the four secured loans described above, specifically: (1) a $1,800,000 term loan to Oaks Investments to finance the purchase of the warehouse and real estate of Gentile Bros. Company (Doc. 46-5, Ex. D-1); (2) a $250,000 revolving line of credit to JAO, and its transportation affiliate, JAO Logistics LLC, to support working capital and general business purposes (*Id.*, Ex. D-2); (3) a $1,750,000 term loan to JAO Distributor and JAO Logistics, LLC to purchase the existing equipment of Gentile Bros. Company (*Id.*, Ex. D-3); and (4) a $2,700,000 term loan to JAO to finance the purchase the business operations of Gentile Bros. Company (*Id.*, Ex. D-4).

28. All four loans were subject to a Credit Agreement dated April 13, 2012 which provided the following specific conditions precedent to the secured loans: (a) Fifth Third would have access to all of the Borrowers' books and records (Doc. 46-6 at ¶ 4.1); (b) Fifth Third would be provided with monthly financial statements, monthly accounts receivable reports, monthly accounts payable reports, an annual financial statement, and an audit of financial statements by a CPA with no disclaimers (*Id.* at ¶ 4.2); (c) Fifth Third would be the sole depository of all accounts of the Borrowers (*Id.* at ¶ 4.9); (d) the Borrowers would pay all fees, costs, and expenses of Fifth Third incurred in negotiating , documenting, and administering the four loans (*Id.* at ¶ 4.12); a right of set off in the event of default (*Id.* at ¶ 6.3); and a late payment penalty of five percent of the loan payment then due (*Id.* at ¶ 6.5).

29. All four loans were subject to Security Agreements dated April 13, 2012 in which JAO Distributors, JAO Logistics, LLC, and Oaks Investments granted Fifth Third security interests in all business assets of the respective corporate debtors, including but not limited to accounts, inventory, proceeds, and equipment. (Doc. 7, Ex. F-1 at ¶ 2, Ex. F-2 at ¶ 2, Ex. F-3 at ¶ 2; Ex. F-4 at ¶ 3).

30. All four loans were subject to Continuing Guaranty Agreements dated April 13, 2012 granted by Jeffrey Oaks, Oaks Investments, JAO Distributors, and JAO Logistics in order to cross-collateralize the four loans. (Doc. 8, Exs. G-1 to G-3).

31. On or about April 13, 2012, Oaks Investments entered into an Open-End Mortgage, Assignment of Rents and Security Agreement with Fifth Third in which it agreed, among other things, to be responsible for payment of all four loans described above, to grant Fifth Third a security interest in and mortgage to the real property from which JAO and its affiliates would operate, as well as an assignment of all rents of the real property, with a default under any of the four loans specifically constituting a default under the Open-End Mortgage of Rents and Security Agreement. (Doc. 46-9) No evidence has been adduced that a lease agreement was ever entered into between JAO and Oaks Investments.

32. On or before April 18, 2012, JAO was granted a PACA license by USDA and commenced operations as a wholesale buyer of fruits and vegetables. (Doc. 46-10).

33. During the first quarter of 2013, JAO—whose operating revenues from produce sales were used for the payment of all four loans with Fifth Third—reported a $188M net loss for its fiscal year end of December 31, 2012, and was in default of its operating leverage covenant. Fifth Third indicated it would send a reservation of rights letter to JAO with respect to the default. (Doc. 46-11 at 2, 8). JAO had lost business from US Foods in late 2012, which had provided 7% ($1.7MM) of JAO's revenues during 2012. (Doc. 46-16).

34. On or about March 21, 2013, JAO advised Fifth Third that it expected to lose its largest customer, Gordon Foods, which accounted for 34% ($8.44MM) of the company's revenue. JAO advised Fifth Third that it hoped to be able to offset some of the lost volume in fiscal 2013 with new business from Sav-a-Lot and Kroger and requested a short-term renewal of its existing $250M revolving line of credit for 4.5 months, with a maturity of September 1, 2013. In deciding whether to approve the requested short-term renewal, Fifth Third noted that the bank was protected by JAO's required monthly reports to the bank on its financial position, as well as the financial covenants required under the loans, and approved renewal without conducting an audit or field exam of JAO's books and records. (Doc. 46-11 at 2, 7–8, 10–11).

35. JAO and Fifth Third entered into a First Amendment to the Credit Agreement in which the $250M revolving line of credit was extended until September 1, 2013 and the Bank's reservation of rights for JAO's failure to comply with its loan covenants was recognized. (Doc. 46-12).

36. JAO's April 2013 Income Statement reported to Fifth Third showed a monthly net income of $11,454.29 and a year-to-date net income of –$331,433.42. (Doc. 46-13). An analysis of JAO's Financial History regarding net income through April 2013 established that JAO was experiencing financial difficulty. (Doc. 46-14).[13]

37. In May 2013, Fifth Third did not increase JAO's monthly payment of the $2.7MM acquisition term loan from $47,917 to $59,000 as required under the loan, but allowed JAO to continue to pay the reduced amount of $47,917. (Doc. 46-6 at ¶ 2.2(c); Doc. 46-15 at Interrogatory No. 15).

---

[13] Here and in Undisputed Fact No. 39, the Court does not use the term "financial difficulty" as a term of art or as a term used to assert a legal conclusion.

38. When JAO financial statements for June 2013 were received by Fifth Third during the first two weeks of July 2013, it was evident that the anticipated new business from Kroger had not materialized.  On or before July 15, 2013, Fifth Third calculated that JAO had posted a loss of $817M and anticipated that JAO would be in continued default of the fixed charge and operating leverage covenants, with projected losses of $1MM through fiscal year December 31, 2013.  On July 15, 2013, Jennifer Schwartz, VP and Portfolio Manager of the four loans, recommended that the loans be placed on "Administrative Status" and that JAO and Oaks Investments regulatory rating be downgraded to "Special Mention."  Schwartz's recommendation to place the loans on Administrative Status and downgrade the rating to Special Mention was formally approved by three other Fifth Third VPs on August 14-15, 2013.  (Doc. 46-16).

39. Fifth Third knew on July 15, 2013, if not before, that JAO was in financial difficulty.  (*Id.*)

40. At meetings held with JAO in July and August 2013, Jeffrey Oaks was advised by Fifth Third that a significant contribution of equity sufficient to cover the current and projected operating losses through fiscal year end December 31, 2013, estimated at $1MM, was required.  (Doc. 46-17 at 4).

41. On or before August 28, 2013, Fifth Third determined it would not be renewing JAO's $250M revolving line of credit for 4.5 months, with a maturity of September 1, 2013.  (Doc. 46-18).

42. On or before September 3, 2013, Fifth Third ordered an appraisal of the real property and warehouse facility from which JAO conducted its produce sales, with the purpose of the requested appraisal listed as "Troubled Asset" by Fifth Third.  (Doc. 46-19).

43. On September 9, 2013, in an e-mail exchange among Fifth Third officials, questions were raised regarding why an audit or field exam of JAO's books and records had not been ordered and whether potential PACA issues with JAO had been considered.  Fifth Third officer Tim Kelly responded that no field exam had been ordered because Fifth Third placed "limited if any value on working capital assets, especially in light of the matured undrawn line."  (Doc. 46-20).  No audit of JAO's books and records was ever conducted by Fifth Third.  (Doc. 46-15).

44. On September 12, 2013, Fifth Third reported that there was a $2.4M collateral shortfall and acknowledged that PACA creditors had a priority lien to JAO's accounts receivables.  Fifth Third downgraded the loans to "Substandard" based

on interim losses posted through July 31, 2013 and continued default of the fixed charge and operating leverage covenants on June 30, 2013.  However, the loans were not considered "impaired" by Fifth Third in September 2013, mainly because of the possibility of an injection of capital by an Oaks family member. Nonetheless, Fifth Third had its Special Assets Group begin "shadowing" the JAO and Oaks lending relationship in September 2013 and reported the relationship would be moved to the Special Assets Group if the required $1MM in equity was not forthcoming.  (Doc. 46-21 at 3-4).

45. On September 30, 2013, Rick Schmipf, JAO's Chief Financial Officer, advised Fifth Third via e-mail that the Oaks family wished to sell the JAO enterprise in the next six to nine months to pay off the bank's loans and desired an agreement that any additional equity injected by them into the operations of the business for working capital purposes in the interim would be afforded a "preference" by Fifth Third.  (Doc. 46-22).

46. In response to this communication and the Oaks family's desire to make only conditional injections of equity, Fifth Third decided in early October 2013 to transfer the four loans to its Special Assets Group for handling.  (Doc. 46-21 at 4). On October 2, 2013, Fifth Third officer Daniel Curry instructed other bank officials via e-mail to make sure all required loan and lease payments due to the bank from JAO and Oaks Investments were "taken" from the borrowers' accounts. (Doc. 46-23 at 2).

47. On October 7, 2013, JAO management advised Fifth Third that it would be winding down its operations with the assistance of a workout/restructuring specialist Leonard Z. Eppel.  JAO management further advised Fifth Third that perishable inventory had been sold in order to satisfy PACA liens and that initial estimates were that JAO receivable collections would be approximately $300M short of JAO payables.   (Doc. 46-21 at 4–5).

48. The JAO Accounts Payable Aging Report dated October 10, 2013, provided to Eppel by JAO management, listed $1,316,286.40 in "Remaining PACA Debt," with $663,269.76 in "Non-PACA" vendor payables and $5,411.25 in "TBD" payables.  Dusty was listed by JAO management as a PACA vendor in the amount of $189,728.50 in the October 10, 2013 report.  (Doc. 46-24).

49. On October 17, 2013, Rick Schmipf, JAO's Chief Financial Officer, advised Eppel via e-mail that check number 14666 to Dusty Acres should not be allowed to clear because it was not a negotiated PACA settlement.  (Doc. 46-25).

50. On October 23, 2013, counsel for JAO, Jason V. Stitt, Esq., sent an e-mail to Eppel in which he stated in pertinent part: "I don't know if Rick got a chance to share with you that I discovered Dusty Acres does not appear to have a current PACA license.  This should mean that Dusty Acres cannot use the invoice method to preserve its trust rights and would have needed to provide a written notice in accordance with PACA within 30 days after the payments were due.  This should take $189K off of the PACA payables."  (Doc. 46-26).

51. Eppel relied on JAO and Stitt and did not conduct any independent investigation to verify Dusty's PACA license status.  (Doc. 46-27 at 3).

52. On or before October 30, 2013, Eppel approved listing the accounts payable owed to Dusty Acres in the amount of $201,578.50 as "non-PACA," making Dusty the largest non-PACA unpaid JAO vendor.  (Doc. 46-28).

53. A review of the bank records of JAO establishes that after July 15, 2013, when Fifth Third knew that JAO was in financial difficulty (*i.e.* that JAO was in default of a loan covenant, had posted a loss of $817M, anticipated that JAO would be in continued default of the fixed charge and operating leverage covenants, projected losses of $1MM through fiscal year December 31, 2013, and recommended that the JAO loans be placed on "Administrative Status" and that the regulatory rating be downgraded to "Special Mention"), Fifth Third received a total of $311,996.83 from JAO's sales proceeds in payment of Fifth Third's loans and various bank and service charges:

**JAO AP Account**

| Date | Amount |
| --- | --- |
| 8/01/13 | $ 13,706.77 |
| | $ 26,101.54 |
| | $ 55,343.17 |
| 8/30/13 | $ 13,675.78 |
| | $ 26,183.64 |
| | $ 55,167.80 |
| 9/20/13 | $  8,096.58 |
| 10/01/13 | $ 13,448.23 |
| | $ 65,835.89 |
| | $ 25,599.26 |
| | $    259.00 |
| | $     74.00 |
| | $     37.00 |
| | $     37.00 |
| Sub Total | $ 303,565.66 |

19

**JAO Operating Account**

| Date | Amount |
|------|--------|
| 8/14/13 | $ 1,286.29 |
| 9/05/13 | $     37.00 |
| 9/6/13 | $     37.00 |
| 9/12/13 | $ 1,166.55 |
| 10/9/13 | $   650.00 |
| 10/9/13 | $ 2,000.00 |
| 10/10/13 | $ 1,157.29 |
| 11/13/13 | $ 2,097.04 |
|  | |
| Sub Total | $ 8,431.17 |

(Docs. 46-29, 46-30).

54. The October 1, 2013 payment from JAO's AP Account in the amount of $65,835.89 received by Fifth Third reflects an increase in the monthly principal payment due on JAO's $2.7MM acquisition term loan from $47,917 to $59,000, plus interest.  (Doc. 46-29; Doc. 46-4 at ¶ 2.2).

### III.    STANDARD OF REVIEW

A motion for summary judgment should be granted if the evidence submitted to the Court demonstrates that there is no genuine issue as to any material fact, and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  The moving party has the burden of showing the absence of genuine disputes over facts which, under the substantive law governing the issue, might affect the outcome of the action.  *Celotex*, 477 U.S. at 323.  All facts and inferences must be construed in a light most favorable to the party opposing the motion.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).

A party opposing a motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . .  must set forth specific facts showing that

there is a genuine issue for trial." *Anderson*, 477 U.S. at 248 (1986).

## IV.    ANALYSIS

Under PACA, dealers must make full payment promptly for any perishable

agricultural commodities ("produce") they purchase.  7 U.S.C. § 499b(4).  One of the

purposes of PACA is to protect unpaid produce sellers.  *Overton Distribs., Inc. v.*

*Heritage Bank*, 340 F.3d 361, 364 (6th Cir. 2003).  In 1984, Congress amended PACA to

create a statutory trust in their favor.  *Id.*  This trust is intended to remedy the burden on

commerce in produce caused by "financing arrangements under which commission

merchants, dealers, or brokers, who have not made payment for perishable agricultural

commodities purchased . . . encumber or give lenders a security interest in, such

commodities, or on inventories . . . derived from such commodities, and any receivables

or proceeds from the sale of such commodities or products."  7 U.S.C. § 499e(c)(1).[14]

---

[14] The legislative history to the amendment explains:

> Sellers of agricultural commodities are often located thousands of miles from their customers. Sales transactions must be made quickly or they are not made at all . . . . Under such conditions, it is often difficult to make credit checks, conditional sales agreements, and take other traditional safeguards. . . . Many [buyers], in the ordinary course of their business transactions, operate on bank loans secured by [their] inventories, proceeds or assigned receivables from sales of perishable agricultural commodities, giving the lender a secured position in the case of insolvency.  Under present law, sellers of fresh fruits and vegetables are unsecured creditors and receive little protection in any suit for recovery of damages where a buyer failed to make payment as required by the contract.

H.R.Rep. No. 98-543, 98th Cong., 1st Sess. 3 (1983).

PACA's trust provision reads, in relevant part, as follows:

> [Produce] . . . and all inventories of food or other products derived from [produce], and any receivables or proceeds from the sale of such [produce or products], shall be held by such . . . commission merchant, dealer, or broker in trust for the benefit of all unpaid suppliers or sellers . . . until full payment of the sums owing in connection with such transactions has been received by such unpaid suppliers [or] sellers[.]

7 U.S.C. § 499e(c)(2).  The PACA trust is a "nonsegregated 'floating' trust."  7 C.F.R. § 46.46(b).  The trust becomes effective at the time a produce buyer accepts shipments of produce.  *Six L's Packing Co. v. Beale*, 524 F. App'x 148, 152 (6th Cir. 2013) (citation omitted).  Protected produce sellers' claims to trust assets take precedence over secured creditors' claims to those assets.  *See Overton*, 340 F.3d 361, 365; *Sanzone-Palmisano Co. v. M. Seaman Enterprises, Inc.*, 986 F.2d 1010, 1012 (6th Cir. 1993); *see also Nickey Gregory Co., LLC v. Agricap LLC*, 597 F.3d 591, 594 (4th Cir. 2010) ("PACA trusts thus give sellers of perishable agricultural commodities a right of recovery that is superior to the right of all other creditors, including secured creditors.").

To claim PACA trust beneficiary status, a produce seller must provide the buyer with written notice of its intent to preserve its trust rights.  7 U.S.C. § 499e(c)(3); *Overton*, 340 F.3d at 365.  Pursuant to a 1995 amendment to PACA, "a licensee may use ordinary and usual billing or invoice statements to provide notice of the licensee's intent to preserve the trust" by including statutorily-prescribed language.  7 U.S.C. § 499e(c)(4). A "licensee" is "any firm who holds an unrevoked and valid unsuspended license issued under [PACA]." 7 C.F.R. § 46.2(*l*).

Every produce dealer must be licensed by the Secretary of Agriculture.  *Baiardi Food Chain v. United States*, 482 F.3d 238, 239 (3d Cir. 2007); *see also* 7 U.S.C. § 499c(a) ("no person shall at any time carry on the business of a commission merchant, dealer, or broker without a license valid and effective at such time").[15]  The Secretary of Agriculture may prescribe the information to be contained in license applications and licensing fees.  7 U.S.C. § 499c(b).  A licensee may renew its PACA license by submitting a renewal application to the USDA and paying the requisite fee.  *See* 7 C.F.R. § 46.9(i).  That regulation provides:

> Under section 4(a) of the Act, at least 30 days prior to the anniversary date of a valid and effective license, the Director shall mail a notice to the licensee at the last known address advising that the license will automatically terminate on its anniversary date unless an application for renewal is filed supplying all information requested on a form to be supplied by the Division, and unless the renewal fee (if any is applicable) is paid on or before such date.  If the renewal application is not filed and/or the renewal fee (if required) is not paid by the anniversary date, the licensee may obtain a renewal of that license at any time within 30 days by submitting the required renewal application and/or paying the renewal fee (if required), plus $50.  Within 60 days after the termination date of a valid and effective license, the former licensee shall be notified of such termination, unless a new license has been obtained in the meantime.

*Id.*

Because PACA is a remedial statute, the Court construes it liberally to effectuate its purposes.  *See Hull Co. v. Hauser's Foods, Inc.,* 924 F.2d 777, 782 (8th Cir. 1991).  However, even a properly licensed PACA claimant must comply with the terms of the statute to preserve its status as a PACA trust beneficiary.  *Overton*, 340 F.3d at 364–65 (denying a licensed PACA supplier status as a PACA trust beneficiary because the

---

[15] A "dealer" is "any person engaged in the business of buying or selling in wholesale or jobbing quantities[.]"  7 U.S.C. § 499a(b)(6).

supplier agreed to accept payment beyond the 30-day limit imposed by statute).

### A.    Preservation of PACA Trust Rights

Defendants claim that because Plaintiff cannot claim PACA trust beneficiary status because he did not have a valid and effective PACA license at the time he delivered produce to JAO.[16]  Under the plain language of the relevant statute, Plaintiff had to be a licensee to preserve his PACA trust rights via the invoice method.  7 U.S.C. § 499e(c)(4) ("a licensee may use ordinary and usual billing or invoice statements to provide notice of the licensee's intent to preserve the trust") (emphasis added).  Plaintiff does not purport to have provided written notice of his intent to preserve his trust rights by any other method.

Plaintiff admits that his PACA license automatically expired on May 21, 2013. (Doc. 48 at 4–5).  However, he argues that he is a licensee because the USDA retroactively reinstated his license.  In a letter to Plaintiff dated February 18, 2014, Jeffrey Davis, Director of the USDA's National Licensing Center, PACA Division, stated as follows:

> I want to apologize to you on behalf of the PACA National License Center regarding the handling of your PACA License Reinstatement application submitted to my office in July, 2013.  Your request was handled inappropriately, and proper processing of the reinstatement was not fully addressed until today.  I am sorry for any inconvenience this has caused your firm.

---

[16] Fifth Third and Eppel both argue that Plaintiff is not entitled to PACA trust beneficiary status.  In fact, Fifth Third incorporates Eppel's arguments by reference.  Accordingly, the Court will address Fifth Third and Eppel's arguments simultaneously and attribute arguments made by either party to "Defendants" collectively.

> This letter confirms Application for Reinstatement of your PACA license and the requisite fees were received in a timely manner by the National License Center in July, 2013 and your PACA license should have been immediately reinstated. However, due to an administrative error in my office, the reinstatement application was not processed.  Our error was uncovered after you contacted us in January, 2014.  <u>Since the license should and would have been reinstated in July, 2013, we have reinstated your PACA license retroactively to the original expiration date of May, 2013. The PACA Division and the National License Center have determined your PACA license never lapsed, with all rights, duties, and obligations remaining in full force and effect at all times.</u>

(Doc. 41, Ex. 1, Brinager Document Production at 146–47) (emphasis added).

Where a statute speaks clearly to the precise question at issue, we "must give effect to the unambiguously expressed intent of Congress."  *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 842–43 (1984).  "[I]f the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute."  *Id.* at 843.  However, "[i]nterpretations such as those in opinion letters—like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law—do not warrant *Chevron*-style deference."  *Christensen v. Harris Cnty.*, 529 U.S. 576, 587 (2000).

An agency's interpretation of its own regulation generally controls.  *See Auer v. Robbins,* 519 U.S. 452, 461 (1997).  However, "[c]ourts need not defer to an agency's interpretation that 'is plainly erroneous or inconsistent with the regulation[s]' or where there is any other 'reason to suspect that the interpretation does not reflect the agency's fair and considered judgment on the matter in question.'"  *In re AmTrust Fin. Corp.*, 694 F.3d 741, 754 (6th Cir. 2012) (quoting *Chase Bank USA, N.A. v. McCoy,* 131 S. Ct. 871,

880–81 (2011)).

Defendants advance a number of arguments as to why the retroactive reinstatement should not control. The Court addresses these in turn.[17]

### 1. Meaning of "Retroactive Reinstatement"

Defendants argue that Davis's letter may not have been intended to afford the broad relief Plaintiff claims it does. Specifically, Defendants note that the language affording retroactive reinstatement without lapse could be construed as an exercise of USDA's prosecutorial discretion, whereby the USDA merely decided not to proceed with charges under against Plaintiff for operating without a license. *See* 7 U.S.C. § 499c(a); 7 C.F.R. §3.91(b)(1)(iii).

The USDA uses broad language in the letter, determining that Plaintiff's PACA license *never* lapsed, with *all* rights, duties, and obligations remaining in full force and effect at *all* times. Further, the USDA was on notice that Plaintiff sought to recover from at least JAO. (*See* Doc. 41, Ex. 1, Brinager Document Production at 130) (e-mail from Plaintiff's counsel, sent prior to the issuance of the letter, explaining "I am working with Dustin Brinager/Dusty Acres and am trying to get them paid from Gentile Bros"). For these reasons, the Court finds that the USDA intended to retroactively reinstate Plaintiff's PACA license for all relevant purposes, not simply to forego charges against Plaintiff for

---

[17] In addition to arguing that Plaintiff had to be a licensee to preserve his trust rights via the invoice method, Defendants also argue that 7 U.S.C. § 499c(a) precludes Plaintiff from claiming trust assets. ("No person shall at any time carry on the business of a commission merchant, dealer, or broker without a license valid and effective at such time.") Under either theory, the Court must determine what weight to give Davis's letter.

operating without a license.[18]

### 2. The Power to Act Retroactively[19]

Defendants argue that the USDA unlawfully usurped legislative power by promulgating a retroactive rule when it had no power to do so under PACA. The Secretary of Agriculture has the power to make rules, regulations, and orders. 7 U.S.C. § 499o. However, "a statutory grant of legislative rulemaking authority will not, as a general matter, be understood to encompass the power to promulgate retroactive rules unless that power is conveyed by Congress in its express terms." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208–09 (1988). "Retroactivity is not favored in the law." *Landgraf v. Usi Film Prods.*, 511 U.S. 244, 259 (1994).

That said, a government agency can correct its own mistake. *See Peoples Fed. Sav. And Loan Ass'n of Sidney v. Comm'r of Internal Revenue*, 948 F.2d 289, 305 (6th Cir. 1991) ("The Commissioner's new regulation is reasonable. His desire to correct a

---

[18] Defendants also argue that because Davis, (as opposed to the Secretary of Agriculture), purported to retroactively reinstate Plaintiff's license with the issuance of a letter, (and not formal rulemaking or formal or informal adjudication), and thereby altered the legal relationships of the parties in the case, the letter could not represent the fair and considered judgment of the USDA. However, these circumstances do not preclude the Court from affording the letter deference. *See Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156, 2166 (2012) (explaining that an agency's interpretation may not reflect its fair and considered judgment where it conflicts with a prior interpretation, or when it appears to be nothing more than a convenient litigating position or a post hoc rationalization made in order to defend past agency action against attack.) However, in *Christopher*, the Court ultimately declined to afford deference to the agency's interpretation, in part because it would "impose potentially massive liability on respondent for conduct that occurred well before that interpretation was announced" and, thereby, "seriously undermine the principle that agencies should provide regulated parties "fair warning of the conduct [a regulation] prohibits or requires." What presents here is different and *Christopher* is therefore distinguishable because it involved a regulation of general applicability, as opposed to a determination about a single license.

[19] Defendants claim that their due process rights have been violated by the USDA's retroactive reinstatement. Their arguments mirror those made regarding the impropriety of retroactive action. For the reasons stated in this section, the Court finds that Defendants' due process arguments are not well taken.

previous ruling later determined to be wrong is not unreasonable, and the freedom of agencies to correct mistakes is a matter of recognized importance in the cases."); *see also United Gas Improvement Co. v. Callery Props., Inc.*, 382 U.S. 223, 229 (1965) ("An agency, like a court can undo what is wrongfully done by virtue of its order."); *Verson Tel. Cos. v. FCC*, 269 F.3d 1098, 1111 (D.C. Cir. 2001) ("As such, the [ ] argument . . . now reduces to the assertion that the agency may not retroactively correct its own legal missteps, even when those missteps have been highlighted by the federal judiciary. But this is not the law."); *S. Ry. Co. v. United States*, 412 F. Supp. 1122, 1147 n. 76 (D.D.C. 1976) (citation omitted) ("An agency has the equitable power 'to regard as being done that which should have been done' by recreating the past, insofar as reasonably possible to reflect compliance with the Act . . .").

The agency action at issue is not rulemaking.[20] Rather than pronounce a retroactive rule, the USDA corrected a licensing mistake. Specifically, the USDA admitted that it failed to timely process Plaintiff's PACA license renewal application, which it received on July 10, 2013.[21]

Defendants also suggest that retroactive reinstatement is inconsistent with PACA's purpose. However, in enacting the 1984 amendment to PACA, Congress was concerned

---

[20] As defined in the Administrative Procedures Act ("APA"), a "rule" is "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency and includes the approval or prescription of the future of rates, wages, corporate or financial structures or reorganizations thereof, prices, facilities, appliances, services or allowances therefore or of valuations, costs, or accounting, or practices bearing on any of the foregoing. 5 U.S.C. § 551(4). As one court noted, "[t]he APA's broad definition of the term 'rule' includes 'virtually every statement an agency may make.'" *Nat'l Treasury Employees Union v. Reagan*, 685 F. Supp. 1346, 1356 (E.D. La. 1988).

[21] The USDA was also required to notify Plaintiff that his license had been terminated on or before July 20, 2013. *See* 7 C.F.R. 46.9(i). It did not do so.

with protecting small farmers and growers, like Plaintiff, who were especially vulnerable to the practices of buyers who operate on bank loans secured by their inventories. Correcting an administrative error and retroactively reinstating Plaintiff's license so as to ensure that Plaintiff retains the rights *he should have had* effectuates the purpose of PACA and its trust provision.

### 3. Equitable Estoppel

Defendants contend that Plaintiff is equitably estopped from claiming PACA trust beneficiary status.   "The doctrine of equitable estoppel means that 'he who by his language or conduct leads another to do what he would not otherwise have done, shall not subject such person to loss or injury by disappointing the expectations upon which he acted.'"  *Olson Distrib. Sys., Inc. v. Glasurit Am., Inc.*, 850 F.2d 295, 296 (6th Cir. 1988) (quoting *Dickerson v. Colgrove,* 100 U.S. 578, 580 (1879)); *see also* 28 Am. Jur. 2d Estoppel and Waiver § 62 (as between two innocent parties, the one who made the loss possible or who could have prevented it must bear legal responsibility).

To the extent Defendants argue that the doctrine of equitable estoppel prevents Plaintiff from claiming PACA trust beneficiary status as against JAO, the Court notes that it has already entered default judgment against JAO.  (Doc. 32).[22]  To the extent that Defendants argue that the doctrine of equitable estoppel prevents Plaintiff from claiming PACA trust beneficiary status as against Fifth Third, the Court finds that Defendants' argument is not well-taken.

---

[22] For the same reason, the Court also declines to entertain arguments that detrimental reliance, due process, or public policy prevent Plaintiff from claiming PACA trust beneficiary status as against JAO.

Defendant argue that (1) the wrong was made possible by Plaintiff's misplaced confidence in the USDA to promptly process his application and update its records; and (2) Plaintiff was not diligent, having let his license lapse and having failed to ensure that his reinstatement application was processed and that the public record was updated. However, the USDA is in ultimate control of whether and when PACA licenses are processed and renewed. Plaintiff submitted his renewal application and fee to USDA on July 10,2013 was not notified by USDA of any issue regarding his renewal application until August 26, 2013, after he had begun shipping produce to JAO. (Doc. 46-2 at ¶4, 6; Doc. 41 Ex. 1, Brinager Document Production at 138–41). Even if Plaintiff petitioned the USDA for relief at that time, retroactive reinstatement of his would have been met with the same objections advanced here. Regardless, USDA has admitted that it mishandled and committed administrative error in the first instance by failing to process Plaintiff's license renewal application on July 10, 2013.

In any event, it is not clear that Plaintiff could have prevented the loss he claims as against Fifth Third or that Fifth Third detrimentally relied on the USDA's termination of Plaintiff's PACA license as to the funds at issue. JAO believed Plaintiff was a PACA vendor as of October 10, 2013 and did not discover the termination via the public records until after its liquidation commenced. (*Compare* Doc. 46-24 *with* Doc. 46-28). Thus, the payments Plaintiff now seeks to disgorge were made *prior* to Fifth Third being made aware of Plaintiff "appearing" to be a non-PACA vendor. Even if Plaintiff's trust beneficiary status had been known to JAO and Fifth Third prior to the settlement with the PACA vendors, the trust assets were not limited to the uncollected accounts receivable as

of October 2013.  *See* 7 U.S.C. § 499e(c)(2) (identifying produce, inventories, and

proceeds as trust assets).  For these reasons, the doctrine of equitable estoppel does not

prevent Plaintiff from asserting licensee status.

### 4. Public Policy

Defendants raise a number of policy arguments.  In large part, these are based on

the premise that Plaintiff should bear burden of the USDA's error because, otherwise,

produce buyers would be required to conduct an inquiry into whether the public record

accurately reflected the status of each PACA claimant.

As an initial matter, the Court notes that PACA requires licensees to pay produce

suppliers promptly, whether they are trust beneficiaries or not.  *See* 7 U.S.C. § 499b(4).

Only when a produce buyer ceases operations without having fully paid its produce

suppliers and secured creditors, must it make a determination as to who is a qualified

PACA trust beneficiary, and in what amount, so as to settle disputes over priority to

limited assets.  Where a produce supplier brings a claim against produce buyer, federal

courts can implement a claims procedure that provides for notice to all produce suppliers

and secured lenders and allows claimants to prove their status and claim amounts.  *See*

*e.g.*, *Superior Sales, Inc. v. Bakker Produce, Inc.*, Case No. 2:13-cv-0026-PPS (N.D. IN);

*Sam Wang Produce, Inc. v. MS Grand, Inc.*, Case No. 8:10-cv-02286-PJM (D. Md).

Here, JAO and Fifth Third chose a different approach, likely in order to save costs and

accelerate the payment of assets to Fifth Third.  A decision not to give notice to potential

PACA trust beneficiaries has its risks.

For these reasons, the Court defers to the USDA's determination that Plaintiff's license has been retroactively reinstated. *See Auer*, 519 U.S. at 461. The Court finds that the agency's action was neither plainly erroneous nor inconsistent with the regulations and that there is no reason to suspect that the interpretation does not reflect the agency's fair and considered judgment on the matter in question.[23]

### B. Bona Fide Purchaser Defense

Plaintiff seeks a judgment in the amount of $251,017, plus statutory prejudgment interest, against Fifth Third. Specifically, Plaintiff seeks disgorgement of payments made to Fifth Third by JAO in August, September, and October 2013.[24] Fifth Third argues that it is protected by the bona fide purchaser defense.

PACA creates a trust which is governed by general principles of trust law, except where those principles conflict with PACA. *Nickey Gregory*, 597 F.3d at 595. "PACA

---

[23] Defendants urge the Court to review the USDA's action under the standard set forth in the APA. The APA provides a cause of action for parties "adversely affected or aggrieved by an agency action within the meaning of a relevant statute . . . ." 5 U.S.C. § 702. Under the APA, a federal court must "hold unlawful and set aside agency action, findings and conclusions found to be . . . arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with the law." *GTE Midwest, Inc. v. Fed. Communications Comm'n.,* 233 F.3d 341, 344 (6th Cir.2000) (quoting 5 U.S.C. § 706(2)(A)) (internal quotation marks omitted). Only final adjudications and rulemaking are subject to judicial review under the APA. *See* 5 U.S.C. § 704. Here, Defendants have not asserted any claim against the USDA pursuant to the APA. Further, because the USDA is not a party to this action, the Court has not been presented with the relevant administrative record. For these reasons, the Court can neither determine whether the relevant agency action is "final," nor hold unlawful and set aside the agency action under the APA.

[24] Plaintiff indicates that $311,996.83 is subject to disgorgement. (*See* Docs. 46-29, 46-30). Defendant Fifth Third argues that $95,151.48 of this sum is *not* subject to disgorgement because it was received prior to August 3, 2013, the date of Plaintiff's first invoice. However, the PACA trust arises upon the commencement of the produce purchaser's business and is continually in existence throughout the life of the purchaser's business for the benefit of all suppliers. *See In re Kornblum & Co., Inc.,* 81 F.3d 280 (2d Cir. 1996); *In re Atlantic Tropical Market Corp.,* 118 B.R. 139, 141–142 (Bankr. S.D. Fla. 1990). Accordingly, the PACA trust *commenced in April 2012* when JAO began purchasing wholesale quantities of produce. (*See* Doc. 46-10). Since Fifth Third has failed to establish that there was a time when all of JAO's PACA trust creditors were paid in full, the Court finds that $311,996.83 is subject to disgorgement.

does not impose explicit obligations upon, or provide explicit remedies against, third-party transferees who receive trust property in breach of trust." *Albee Tomato, Inc. v. A.B. Shalom Produce Corp.*, 155 F.3d 612, 615 (2d Cir. 1998). However, "when trust assets are held by a third party, resulting in the failure of the trustee to pay unpaid sellers of perishable agricultural commodities, the third party may be required to disgorge the trust assets unless the third party can establish that it has some defense, such as having taken the assets as a bona fide purchaser[.]" *Nickey Gregory*, 597 F.3d at 595–96.

A bona fide purchaser is one who takes trust property "for value and without notice of breach of trust." *Endico Potatoes, Inc. v. CIT Grp./Factoring, Inc.*, 67 F.3d 1063, 1068 (2d Cir. 1995) (quoting Restatement (Second) of Trusts § 284 (1959)). "A third-party transferee may escape liability, therefore, if it: (i) gave value for the trust property and (ii) had no actual or constructive notice of the breach of trust." *Albee Tomato*, 155 F.3d at 615. The burden of proof in establishing the protected status of a bona fide purchaser is on the transferee. *Id.*

### 1. "For Value" Prong

Ordinarily, where "the trustee transfers trust property in consideration of the extinguishment of a pre-existing debt or other obligation, the transfer is not for value." Restatement (Second) of Trusts § 304(1). However, a transferee may receive trust property if the property is "a negotiable instrument or money." *Id.* § 304(2)(a).

> When secured lenders use their security agreement to foreclose on property or otherwise enforce their contractual rights, they essentially force the transfer of trust property in satisfaction of an antecedent debt. Any such transfer, including transfers of negotiable instruments and money, through the exercise of rights under a security agreement is not for value. Most trust assets such as inventory or

accounts receivable will be converted to money before being transferred.  To hold otherwise would essentially permit secured creditors to "trump" unpaid beneficiaries of PACA trusts by simply enforcing their security agreement outside of the formalities of bankruptcy.

*C.H. Robinson Co. v. Trust Co. Bank, N.A.,* 952 F.2d 1311, 1315 n. 5 (11th Cir. 1992).

For these reasons, the "for value" portion of the bona fide purchaser standard only protects secured lenders who receive PACA trust assets *in the ordinary course of business.  Consumers Produce Co.*, 16 F.3d 1374, 1385, n. 3 (3d Cir. 1994).

The Court need not decide whether the relevant transfers were made in the ordinary course of business because neither Plaintiff nor Fifth Third are entitled to summary judgment on the question of whether Fifth Third should have known  of a breach of trust.

### 2.  "Notice" Prong

A person has notice of a breach of trust if he knows or should know of the breach of trust.  Restatement (Second) of Trusts § 297.  A transferee should know of a breach of trust when:

> [H]e [or she] knows facts which under the circumstances would lead a reasonably intelligent and diligent person to inquire whether the trustee . . . is committing a breach of trust, and if such inquiry when pursued with reasonable intelligence and diligence would give him [or her] knowledge or reason to know that the trustee is committing a breach of trust.

Restatement (Second) of Trusts § 297 cmt. a.

In the PACA context, once a lender has knowledge that a borrower was experiencing financial difficulties, or was failing to pay his or her suppliers, the lender

has a duty of inquiry.  *Consumers Produce Co.,* 16 F.3d at 1383.[25]  The existence and the extent of a duty of inquiry depend on the character of the transaction and the character of the trust property.  *Id.*  If such an inquiry would have revealed the breach of the trust, then the person "should have known" of the breach.  *Gargiulo v. G.M. Sales, Inc.*, 131 F.3d 995, 1000 (11th Cir. 1997).[26]  Here, there is no evidence that Fifth Third had *actual* knowledge that JAO was in breach of its PACA trust by failing to timely pay suppliers.  <u>Accordingly, the Court is tasked with determining whether Fifth Third had a duty of</u> <u>inquiry and, if so, whether its inquiry would have revealed a breach of trust.</u>

Plaintiff relies on—and Fifth Third distinguishes this case from—*Albee Tomato*. There, although the secured lender required and received financial reports, none of which reflected overdue PACA payables, the  unaudited financial statements provided by the trustee's accountant were accompanied by a broad disclaimer, calling their accuracy into question.  *Albee Tomato*, 155 F.3d at 616.  Further, the trustee's checking account frequently exceeded its overdraft privileges, even if for only part of the day.  *Id.*  The Second Circuit held that the secured lender, KCB, had not established that it was entitled to summary judgment as a bona fide purchaser "where the line of credit or account reflects a consistently negative balance absent evidence of a more searching inquiry into the  borrower's observance of trust obligations."  *Id.* at 618.  The court noted that

---

[25] Fifth Third acknowledged that  produce sellers who were entitled to PACA trust benefits would have a priority lien on JAO's assets in the event JAO defaulted.  (Doc. 46-4 at 8).

[26] Put another way, where a PACA trustee has self-evident cash-flow problems, the lender "must make the kind of inquiry as to debts owed by the trustee to PACA beneficiaries that a reasonably prudent lender would make as to debts owed by a similar borrower to a prior creditor who had rights superior to those sought by the lender."  *Albee Tomato*, 155 F.3d at 617.

"[u]nder PACA . . .  the key issue is not whether KCB reasonably expected its loans to be repaid but whether KCB had any reason to believe that [PACA trust creditor] Shalom was not paying appellants, its suppliers." *Id*. at 617.

The particular circumstances that caused the court pause in *Albee Tomato* are not present in this case.  There is no evidence that Fifth Third had reason to suspect that JAO's financial statements were not trustworthy.  There is also no evidence that JAO's accounts were overdrawn or that JAO missed a loan payment prior to October 2013.  (*See* Doc. 42-1., Exs. B, G, I, T).

Nonetheless, the undisputed evidence shows that JAO was experiencing financial difficulty sufficient to trigger a duty of inquiry.  As of July 15, 2013, Fifth Third knew that JAO: (1) was in default of its fixed charge and operating leverage loan covenants since December 31, 2012; (2) had lost its major customers and posted a loss of $817M as of June 30, 2013; and (3) had year-end projected losses exceeding $1MM.  (Doc. 46-16). Further, Fifth Third advised JAO in July and August 2013 that a significant contribution of equity sufficient to cover the current and projected operating losses through fiscal year end ($1MM+) was required.  (Doc. 46-17 at 4).  In August and early September 2013, Fifth Third determined it would not renew JAO's line of credit, ordered an appraisal of JAO's real property and warehouse as a "troubled asset," reported a collateral shortfall, and downgraded the JAO loans to "substandard" based on interim losses posted through July 31, 2013 and the continued default of loan covenants.  (Doc. 46-21 at 3–4). Accordingly, a duty to inquire whether PACA suppliers were being timely paid arose at some point between July and September 2013.

Fifth Third argues that no inquiry into the status of JAO's payables was necessary because the bank had realistic expectations that the Oaks family, who had significant "skin in the game," would inject the $1MM in equity necessary to keep JAO afloat.  (*See* Doc. 41-2 Ex. T).  Fifth Third also contends that it diligently monitored JAO and was not required to conduct a field audit under the circumstances, especially since JAO was a relatively new company.  While these circumstances may impact precisely when the duty of inquiry arose, they do not negate the undisputed evidence, set forth above, that JAO was experiencing substantial financial difficulty.

In sum, Fifth Third had a duty of inquiry as to whether PACA suppliers were being timely paid.  However, on the record before it, the Court cannot resolve, as a matter of law, precisely when this duty arose or what the inquiry would have shown with regard to the payment of PACA creditors. [27]  Accordingly, the Court cannot resolve, as a matter of law, whether the bona fide purchaser defense is applicable.

---

[27] Fifth Third contends that JAO did not default on payments to its PACA suppliers until the last month of its operations.  However, Plaintiff presents some evidence that JAO failed to timely pay at least one of its produce suppliers as of late August 2013.  (*See* Doc. 52-1).  Plaintiff would be entitled to judgment as a matter of law if he presented undisputed evidence, that when the duty of inquiry arose, the inquiry would have revealed a breach of trust.  The Court does not have such evidence before it at this time.

## V.    CONCLUSION

Accordingly, for the foregoing reasons:

(1) Defendant Fifth Third Bank's motion for summary judgment (Doc. 40) is
     **DENIED**;

(2) Receiver Leonard Eppel's motion for summary judgment (Doc. 43) is
     **DENIED**; and

(3) Plaintiff Dustin Brinager's motion for summary judgment (Doc. 46) is
     **DENIED**.

**IT IS SO ORDERED.**

Date:  8/10/15                                         *s/ Timothy S. Black*
                                                        Timothy S. Black
                                                        United States District Judge